IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| In re: ) | |
| ) | Case No. BK21-80939 |
| KAREN WRIGHT, ) | |
| ) | Chapter 7 |
| Debtor. ) | |
| _____ ) | _____ |
| ) | |
| DANIEL J. CASAMATTA, acting ) | Adv. Pro. 22-8011 |
| United States Trustee, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | |
| ) | |
| KAREN WRIGHT, ) | |
| ) | |
| Defendant. ) | |
| ) | |

**Order Granting Objection to Discharge**

This matter is before the court on the complaint objecting to discharge under 11 U.S.C. §§ 727(a)(2), 727(a)(3), 727(a)(4), and 727(a)(5) filed by the plaintiff Daniel J. Casamatta, acting United States Trustee, against the debtor Karen Wright. Sarah E. Tomlinson appeared for the plaintiff. The debtor appeared *pro se*. For the reasons stated below, the debtor is denied a discharge.

**Findings of Fact**

The debtor filed her Chapter 7 petition after gambling away a significant amount of her assets. Though she gambled for many years, she did not deem it to be a problem until 2019 when she went through a divorce. She gambled up to and after the date of filing believing she could "win big" and pay off her debts. (Doc. #96, 47:3-48:2; 58:13-21). The debtor has a master's degree in management and a minor in finance. She has an associate degree in paralegal studies but did not work as a paralegal. She worked as a logistics manager for the Union Pacific Railroad but has been on disability since August 2015. (Doc. #96; 25:8-26:23)[1]

The debtor decided to file bankruptcy and cancelled her ability to withdraw money at casinos in August 2021. She did not immediately file because she needed "a couple of months to be able to go through all the forms and everything." The debtor testified she did not hire an attorney because she could not afford one. She completed her

---

[1] Cited docket numbers refer to filings in Case No. BK21-80939 unless otherwise stated.

1

Chapter 7 petition, statements, and schedules without assistance, and filed them on October 1, 2021. (Doc. #1; Doc. #96, 12:2-13; 34:11-35:13; 44:6-45:19).

For assets, the debtor scheduled cash on hand of $100. A few days before filing, she sold a 1948 Cadillac for $9,000, which she disclosed on her Statement of Financial Affairs ("SOFA"). (Doc. #1, Pg. 63). It is not clear whether the debtor received the $9,000 on August 22 or August 28 but based upon her testimony and use of the proceeds, it appears she received the funds on August 28, only four days before she filed her bankruptcy petition. She cashed the check at the buyer's bank and used some of the cash to purchase money orders. She testified that she deposited some of the cash, but her bank records do not show a deposit.

The debtor attempted to account for the Cadillac proceeds in a written summary. The summary accounts for only $7,916.33. The debtor says she used Cadillac proceeds to purchase money orders to pay $2,000 to her friend Jeri Brandon on account of a short-term debt; $800 to Harrah's Casino for an overdraft from August; $338 for her bankruptcy filing fee; and $300 for her domestic support obligation. (Doc. #133).

The debtor did use Cadillac proceeds to purchase two money orders to pay Jeri Brandon. But the money orders were obtained *post-petition*, on October 4, 2021, for $1,000 each. (Doc. #98).[2] This means the debtor had another $2,000 cash on hand the date she filed, which she did not disclose. It also means her SOFA was not correct because it states the debtor paid Ms. Brandon $2,000, *pre-petition* on September 28, 2021. Also, under "Amount you still owe", as to Ms. Brandon, the debtor scheduled $0.00. The debtor did not list Ms. Brandon as a pre-petition creditor in any filing or amended filing. (Doc. #1, Pg. 58).

Two of the money orders the debtor stated she purchased with Cadillac proceeds were obtained September 1, 2021, *before* she sold the Cadillac. They included a $338 money order for her bankruptcy filing fee,[3] and a $300 money order, presumably for her domestic support obligation. Therefore, the debtor had another $638 in cash she did not disclose, which increases the total undisclosed cash from the Cadillac sale to $3,721.67.[4] The debtor testified under cross examination she did not know how much

---

[2] Six money orders were received into evidence. (Doc. #98). The debtor asserted she provided several other money orders to the plaintiff, which was disputed. The debtor did not offer any other money orders into evidence. The debtor offered a written summary of money orders she purchased from May 5, through October 4, 2021. (Doc. #141). The summary does not include other money orders or account for the entire $9,000 in Cadillac proceeds.

[3] The debtor testified she cashed out the money order for the filing fee and obtained a different money order to pay the fee. The second money order was not offered into evidence and is not listed on the debtor's summary of money orders. (Doc. #141).

[4] The $3,721.67 includes the $1,083.67 for which the debtor could not account in the summary, the $2,000 paid to Jeri Brandon post-petition, and the $638 in money orders purchased before the Cadillac was sold.

cash she had on hand when she filed. She did not keep complete records of cash transactions, even after August 2021 when she decided to file bankruptcy. Also, regarding cash, the debtor withdrew $9,116.86 from ATMs from October 2020 through September 2021. (Doc. #108). She did not have receipts for the cash expenditures and could not fully account for how she spent the funds.

The debtor scheduled a U.S. Bank account with a balance of $100.[5] (Doc. #1). Her account statement shows an October 1 balance of $3,936.53.[6] The debtor testified she scheduled $100 because she believed it would be the amount remaining after she paid her bills. But she wrote only one check in October, a $1,184.30 check for rent, which was dated October 1. The rent check cleared her account on October 4, leaving a balance in the account of $1,843.62.[7] She made an electronic payment of $800 on October 5 to Harrah's Casino.[8] Her bank account never had a balance below $343.21 through October 20. (Doc. 106, Pgs. 55-59).

The debtor scheduled $300 in jewelry. In the two months before she filed bankruptcy the debtor sold several items of jewelry and received $3,393.67. She did not schedule the sales as transfers on her SOFA.[9] (Doc. #103; Doc. #104). The debtor testified she did not understand her obligation to disclose the sales. She received the jewelry as gifts and did not understand gifts had to be disclosed. The debtor testified about the jewelry during the 341 meeting of creditors and agreed to amend her filings. She did not amend until January 12, 2022, after the deadline to object to discharge passed, and a month after the plaintiff filed a motion to dismiss for bad faith. (Doc. #13).

---

[5] The debtor scheduled five other bank accounts with a cumulative total of $15.74.

[6] The balance in the account includes a social security disability payment of $3,818.98 on October 1. (Doc. #106, Pgs. 55-59). The debtor did not claim the funds as exempt. (Doc. #1, Schedule C).

[7] The debtor's bank statement also shows a $500 external web transfer to "VERICU". It is not clear to whom this transfer was made. But the debtor also has a bank account with Veridian Credit Union.

[8] It is not clear whether this post-petition "ACH Check" payment was for new gambling or was the $800 the debtor paid for her August Harrah's overdraft. (Doc. #96, 61:3-62:8, 64:5-13). If for the pre-petition overdraft, Harrah's is not listed as a creditor on her original Schedule E/F. Also, the funds were from the debtor's U.S. Bank account, not from a money order. No money order is in evidence payable to Harrah's. (Doc. #98; Doc. #141). This would increase the pre-petition cash for which the debtor did not account to $4,521.67. It is possible the $800 is part of the $1,342 she gambled in October. (Doc. #33).

[9] As to jewelry sales, Express Gold Cash paid the debtor $1,858.67 on August 30. Sol's Jewelry paid her $425 on August 18; $655 on August 25; $355 on August 23; and $100 on September 13. (Doc. #103; Doc. #104).

3

Before filing bankruptcy, the debtor withdrew her entire 401(k) account with Vanguard, which contained over $200,000.[10] (Doc. #99; Doc. #100). The debtor believes the funds were used for gambling but does not know and testified she has no way of knowing exactly when all the funds were spent. She testified she spent all her 401(k) proceeds by May 2021. The debtor was definitive regarding this date because in May 2021 she attended a show cause hearing in her divorce proceedings and informed the state court judge the funds were spent.

The debtor attempted to show how and when she spent the Vanguard proceeds in a spreadsheet she provided to the plaintiff. (Doc. #39). As to the final Vanguard withdrawal in 2021, she starts with a balance of $87,065.99 as of January 4, 2021.[11] She reduces this amount with expenditures from her U.S. Bank checking account statements. The ending date of the accounting is August 17, with a final payment of $1,500, leaving her a negative balance of $1,104.09 on that date. The accounting conflicts with the debtor's testimony that she spent all her 401(k) funds by May 2021 because it states she still had $27,710.80 in Vanguard proceeds on June 1, 2021.

The plaintiff identified significant flaws in the debtor's accounting which made it misleading. The debtor used expenditures from her U.S. Bank account to explain how she spent her 401(k) proceeds. But the debtor did not deposit the proceeds into this account. Although she testified that she deposited at least $60,000 into her U.S. Bank account, the deposit does not appear on her U.S. Bank statements or on any bank statements in evidence.[12] The accounting does not consider other deposits into the account including $44,990.51 total from her employer and for social security.[13] The accounting does not reflect gambling winnings in 2021, which totaled over $100,000. The debtor agreed the accounting was not accurate, but stated it was her "best attempt" to show how she spent some of the Vanguard proceeds.

Despite testifying she incurred significant gambling losses, the debtor answered "No" to the question on her SOFA, "Within 1 year before you filed for bankruptcy or since you filed for bankruptcy, did you lose anything because of … gambling?" (Doc.

---

[10] The debtor's Vanguard account statement shows an ending balance of $211,571.81 on June 30, 2020. Her statement ending September 30, 2020, shows an ending balance of $114,999.64 and withdrawals totaling $96,573.11 during the three-month period. Her statement ending March 31, 2021, shows a balance of $0.00 and withdrawals totaling $116,065.23 during the three-month period. (Doc. #39).

[11] The withdrawal totaled $116,065.23 but was not qualified. The debtor incurred a tax penalty. Vanguard presumably withheld the difference for tax purposes.

[12] The bank statements show deposits other than income totaling $16,300 from January 1 through May 26, 2021. They also show several deposits listed as "returned withdrawals". The latter did not constitute new deposits.

[13] The $44,990.51 includes $14,800.71 in deposits into the U.S. Bank account from Union Pacific and $30,189.80 for Social Security payments through August 17, 2021.

#1 Pg. 61). The debtor stated she did not read the entire question. She did not amend the SOFA until January 12, 2022.[14]

The debtor continued to gamble after she decided to file bankruptcy. Even though she cut off her ability to withdraw funds from casinos, she gambled $1,220 in August, and $1,325 in September 2021. She gambled after filing, spending $1,342 in October. (Doc. #33). She testified she now limits her gambling expenses to $20 each month.

The debtor's divorce became final approximately a year before she filed bankruptcy. The state court ordered she pay alimony of $300 per month, an equalization payment of $25,000, and some amount of attorney fees to her ex-husband's attorney. The equalization judgment would accrue interest if not paid by September 2021. Her ex-husband's attorney attempted to collect. In response the debtor emailed the attorney on January 27, 2021, stating she could only afford to pay $5.00 to the attorney and $5.00 to her spouse each week. On February 25, 2021, the debtor emailed the attorney, "[I] gambled away my 401-k, jewelry, and car." It is not clear whether she still had 401(k) proceeds after February 25, 2021, but her gambling summary indicates she spent $40,323 on gambling in March 2021; $13,602.65 in April, $36,224.29 in May; and $12,816 in June 2021. (Doc. #33).

The plaintiff contends there are other omissions from the debtor's schedules. He contends the debtor should have included her gambling winnings and proceeds of sales of personal property as income on Schedule J and should have budgeted her gambling expenses. She also should have scheduled an e-bay account she used to sell property. The debtor amended her schedules multiple times after the plaintiff's office pointed out flaws, after the plaintiff filed a motion to dismiss for bad faith, and after the deadline for her creditors to object to discharge passed. The plaintiff asserts the amended filings did not resolve all the issues his office raised.

In the month before she filed bankruptcy, the debtor paid $4,200 to her sister, Linda Thorn, an insider. (Doc. #1, Pg. 59; Doc. #96, 70:15-20; Doc. #132).

---

[14] The debtor did disclose some gambling information in her original SOFA, but the full extent of her gambling losses is not evident in her original filings. Under "other income", the debtor stated she received "Casino Gross Winnings" with "no deductions for losses" totaling $62,237 in 2019; $208,963 in 2020; and $160,159.64 year to date in 2021. She also listed "loan repayments" totaling $5,100 to Harrah's Council Bluffs and Horseshoe Casino from June through September 2021. She did not list any casino as a creditor. (Doc. #1).

5

**Conclusions of Law**

The Bankruptcy Code is designed to give honest but unfortunate debtors a fresh start. *See McDermott v. Petersen (In re Petersen)*, 564 B.R. 636, 644 (Bankr. D. Minn. 2017). The fresh start is accomplished through the bankruptcy discharge, which is a privilege not a right. *See Bauer v. Iannacone (In re Bauer)*, 298 B.R. 353, 357 (B.A.P. 8th Cir. 2003) (citing *Grogan v. Garner*, 498 U.S. 279, 286 (1991)). The plaintiff seeks an order denying the debtor a discharge, asserting the debtor transferred property pre-petition under § 727(a)(2)(A); transferred and concealed property post-petition under § 727(a)(2)(B); failed to keep and maintain adequate records under § 727(a)(3); made a false oath under § 727(a)(4); and failed to explain the loss of assets under § 727(a)(5). The debtor's conduct in the bankruptcy case may justify the court denying a discharge. Denial of a discharge is a "harsh and drastic penalty." *Korte v. U.S. Internal Revenue Serv. (In re Korte)*, 262 B.R. 464, 471 (B.A.P. 8th Cir. 2001) "The burden of proof in a denial of discharge case is on the objecting party." *Id.* "The provisions of § 727 must be strictly construed in a debtor's favor." *McDermott v. Swanson (In re Swanson)*, 476 B.R. 236, 240 (B.A.P. 8th Cir. 2012).

*False Oath Under § 727(a)(4)*

The plaintiff asserts the debtor made false oaths of material facts in her bankruptcy schedules and SOFA, and at her 341 meeting of creditors. The debtor is not entitled to a discharge if she "knowingly and fraudulently, in or in connection with the case … made a false oath or account." 11 U.S.C. § 727(a)(4)(A). The bankruptcy system "depends upon the debtor providing complete, accurate and reliable information in the petition and other documents submitted with the petition so that parties in interest may evaluate a debtor's assets and liabilities and appropriately administer the case." *Horizon Fin. Bank v. Borstad (In re Borstad)*, 550 B.R. 803, 833 (Bankr. D.N.D. 2016); *see also Home Serv. Oil Co. v. Cecil (In re Cecil)*, 542 B.R. 447, 454 (B.A.P. 8th Cir. 2015) ("Full disclosure is required, not only to ensure that creditors receive everything they are entitled to receive under the Bankruptcy Code, but also to give the bankruptcy system credibility and make it function properly and smoothly[.]").

> [T]he Bankruptcy Code requires disclosure of all interests in property, the location of all assets, prior and ongoing business and personal transactions, and, foremost, honesty. The failure to comply with the requirements of disclosure and veracity necessarily affects the creditors, the application of the Bankruptcy Code, and the public's respect for the bankruptcy system as well as the judicial system as a whole.

*National Am. Ins. Co. v. Guajardo (In re Guajardo)*, 215 B.R. 739, 742 (Bankr. W.D. Ark.1997). The debtor's bankruptcy petition, and the accompanying schedules, and statements, "must be accurate and reliable, without the necessity of digging out and conducting independent examinations to get the facts." *Korte*, 262 B.R. at 474.

> Section 727(a)(4)(A) "provides a harsh penalty for the debtor who deliberately secretes information from the court, the trustee, and other parties in interest in his case."... For such a false oath or account to bar a discharge, the false statement must be both material and made with intent.

*Id*. The materiality element is clearly met in this case. The threshold for materiality is "fairly low". *Id*. "The subject matter of a false oath is 'material' and thus sufficient to bar discharge, if it bears a relationship to the bankrupt's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of his property." *Id*.

"Proving the requisite actual intent with direct evidence is difficult." *Id*. at 472. "[S]tatements made with reckless indifference to the truth are regarded as intentionally false." *Id*. at 474. Fraudulent intent may be 'inferred from the facts and circumstances of the debtor's conduct.'" *U.S. Trustee v. Beard (In re Beard)*, 595 B.R. 274, 295 (Bankr. E.D. Ark. 2018). The cumulative effect of falsehoods evidencing a "pattern of reckless and cavalier disregard for the truth" may support a finding of fraudulent intent. *Id*.

The debtor misrepresented her true financial position in her schedules and SOFA, which remained uncorrected several months after she filed. She amended her schedules and SOFA only after the plaintiff's office investigated, found discrepancies, and filed a motion to dismiss for bad faith. The discrepancies are material. They are numerous. The cumulative effect and nature of the falsehoods demonstrate a pattern of reckless and cavalier disregard for the truth and establish the requisite fraudulent intent.

The debtor scheduled $100 in her U.S. Bank account. On the day she filed, the account contained almost $4,000. The debtor scheduled only $100 of cash on hand. She had significantly more. She sold her Cadillac for $9,000 two days before filing. She did not deposit the proceeds in a bank account. She cashed the check and used the cash to purchase money orders. She could not account for $1,083.67 of the Cadillac proceeds when questioned.

Her accounting of the Cadillac proceeds, which detailed the money order purchases, was inaccurate and misleading and indicated she could not account for at least $3,721.67 in Cadillac proceeds. The documentation revealed other inaccuracies in her schedules. Post-petition the debtor used cash to purchase $2,000 in money orders to pay her friend Jeri Brandon on account of a pre-petition debt. She scheduled the payment to Ms. Brandon as occurring pre-petition. She did not schedule the debt.

The debtor did not disclose she sold personal property including jewelry for cash online and to pawn shops. She did not disclose an eBay account and sales of property through the account. She did not disclose hundreds of thousands of dollars of gambling losses on her SOFA.

7

She continued her false oath at her 341 meeting when she testified her schedules and statements were true and correct. She testified inconsistently during her 341 meeting and during trial. Documentary evidence refuted her testimony and claims, such as her testimony she deposited a large withdrawal from her Vanguard 401(k) account into her U.S. Bank account. Her accounting of the withdrawn Vanguard proceeds was also inaccurate and misleading.

Other "badges of fraud" exist in this case. *Beard*, 595 B.R. at 291 ("Courts generally look to certain factors referenced as "badges of fraud" to determine whether fraudulent intent exists."). "Badges of fraud" include transfers to family or friends; secrecy of conveyances; and general chronology of events and transactions under inquiry. *Kaler v. Huynh (In re Huynh)*, 392 B.R. 802, 810 (Bankr. D.N.D. 2008). Courts are "free to consider any other factors bearing upon the issue of fraudulent intent." *Ritchie Capital Mgmt., LLC v. Stoebner*, 779 F.3d 857, 863 (8th Cir. 2015) (citation omitted).

In addition to the post-petition transfers to Ms. Brandon, shortly before filing the debtor transferred $4,200 of her property to her sister, an insider, on account of a pre-petition debt. She sold jewelry and other personal property and did not disclose the sales. She gambled her assets away while avoiding her domestic support obligations and court-ordered attorney fees in her divorce proceeding. The debtor misrepresented her financial condition to her ex-husband and his attorney. She offered to pay them $10 per month while she gambled away thousands of dollars. She told the state court judge she had no funds at a show cause hearing in May 2021 but gambled $36,224.29 in May and $12,816 in June. She appeared motivated to file in part to attempt to avoid paying the property settlement judgment due to her ex-spouse. She filed bankruptcy within the month after her $25,000 property equalization payment became due.

*Transfer or Concealment of Assets Under § 727(a)(2)*

The debtor is not entitled to a discharge if she with "intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property … transferred, removed, destroyed, mutilated, or concealed", property of the debtor within one year before filing her petition or property of the estate after filing their petition. *See* 11 U.S.C. § 727(a)(2). The debtor transferred and concealed large amounts of cash and other property both pre-petition and post-petition. Many of the transfers of personal property and cash occurred after she decided to file for bankruptcy. The facts stated above demonstrate her intent to hinder and delay creditors, including her ex-husband.

*Failure to Preserve Records Under § 727(a)(3)*

The debtor is not entitled to a discharge if she:

> concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case.

11 U.S.C. § 727(a)(3). "Debtors are required to keep adequate financial records to enable parties and the Court to trace the debtor's financial history, reconstruct financial transactions, and test the completeness of the disclosure requirements." *Miller v. Pulos (In re Pulos)*, 168 B.R. 682, 690 (Bankr. D. Minn.1994). The debtor chose to operate on a cash basis with over a hundred thousand dollars. She kept 401(k) proceeds, gambling winnings, and proceeds of sales out of her bank account, purchasing money orders. She did not keep adequate records of how her cash was spent, even after she decided to file bankruptcy in August 2021. The records she did provide included summaries she created which were not accurate. Under the circumstances, she did not preserve records from which her financial condition could be determined.

*Deficiency of Assets Under § 727(a)(5)*

The debtor is not entitled to a discharge if she "failed to explain satisfactorily, before determination of denial of discharge under this paragraph, any loss of assets or deficiency of assets to meet the debtor's liabilities." 11 U.S.C. § 727(a)(5).

> If the explanation is too vague, indefinite, or unsatisfactory then the debtor is not entitled to a discharge. The explanation given by the debtor must be definite enough to convince the trial judge that assets are not missing. An important component in ascertaining the reasonableness of any explanation is its capacity for verification; that is, is the explanation sufficient to enable either the trustee or a creditor to properly investigate the circumstances surrounding the loss or deficiency. Unsubstantiated, uncorroborated and undocumented testimony from the debtor is not likely sufficient.

*Allred v. Vilhauer (In re Vilhauer)*, 458 B.R. 511, 514–15 (B.A.P. 8th Cir. 2011) (internal citations omitted). For the reasons stated above, the debtor did not explain the loss or deficiency of her assets. The court is not left with the requisite belief assets are not missing.

**Conclusion**

The debtor is denied a discharge under 11 U.S.C. §§ 727(a)(2), 727(a)(3), 727(a)(4), and 727(a)(5). A separate judgment will be entered.

Dated: September 7, 2022

BY THE COURT:

/s/ Brian S. Kruse
Brian S. Kruse
Bankruptcy Judge

Notice given by the court to:
\* Sarah E. Tomlinson
Karen Wright, debtor

Movant (\*) is responsible for giving notice to other parties if required by rule or statute.